

I N T H E

# Court of Appeals of Indiana

In the Matter of the Civil Commitment of:
T.M.,

*Appellant-Respondent*



FILED

Apr 30 2025, 10:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Community Health Network, Inc.,

*Appellee-Petitioner*

---

April 30, 2025

Court of Appeals Case No.
24A-MH-1437

Appeal from the Marion Superior Court

The Honorable David Certo, Judge
The Honorable Phyllis J. Garrison, Judge Pro Tempore

Trial Court Cause No.
49D08-2405-MH-22169

---

**Opinion by Judge Pyle**

Judges Bradford and Kenworthy concur.

**Pyle, Judge.**

## Statement of the Case

T.M. ("T.M.") appeals her temporary involuntary civil commitment[1] to the Community Health Network ("the hospital") for her treatment of mental illness. Although T.M. has been released, she argues that: (1) her appeal is not moot under the public interest exception to the mootness doctrine; (2) there was insufficient evidence supporting her commitment order; and (3) there were procedural issues that amounted to fundamental error. Concluding that the public interest exception applies to T.M.'s claims, that there was sufficient evidence supporting her commitment order, and that the procedural irregularities did not constitute fundamental error, we affirm the trial court's judgment.

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs,* 27 N.E.3d 271, 273 n. 1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; (2) "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

[2] We affirm.[2]

## Issues

1. Whether T.M.'s appeal is moot.

2. Whether there was sufficient evidence supporting T.M.'s commitment order.

3. Whether the procedural irregularities constituted fundamental error.

## Facts

[3] T.M. is a fifty-four-year-old woman who has been diagnosed with schizo-affective disorder, bipolar type. On May 8, 2024, her outpatient treatment center requested that she be transferred to the emergency room. On May 9, 2024, T.M. was taken to the hospital in Indianapolis for emergency detention. From May 13, 2024 onward, T.M. was a patient of Psychiatrist Kanwaldeep Sidhu ("Dr. Sidhu"). On May 16, 2024, the hospital filed a petition for temporary commitment. In its petition, the hospital alleged that, in its opinion, "holding the hearing in the courtroom would have a harmful effect on [T.M.]'s health or well-being." (App. Vol. 2 at 17). The trial court issued an order that same day setting the commitment hearing for May 21, 2024, "over video[.]" (App. Vol. 2 at 24). T.M. did not object to the hearing being held over video.

---

[2] We held an oral argument in this case on April 8, 2025 at the Indiana Statehouse. We thank the parties for their able advocacy.

[4] The trial court remotely held a commitment hearing on May 21, 2024. The trial court had technical difficulties with its camera during the hearing, and as a result, the trial court conducted the hearing without turning on its camera. However, the trial court's microphone worked without issue during the hearing. Neither party objected to the trial court's lack of a camera view nor did either party state that it was unable to hear the trial court. At one point during the hearing, T.M. and her counsel were moved to a breakout room so that they could confer; they later returned to the hearing.

[5] At the hearing, Dr. Sidhu testified that, when he had first seen T.M. on May 13, she had presented as irritable, agitated, and angry. Dr. Sidhu also testified that T.M. had reported having depression, anxiety, and sadness. Dr. Sidhu testified that T.M. had "always expresse[d] paranoid intentions from other people[.]" (Tr. Vol. 2 at 14). He further stated that T.M. "believe[d] that others are either out to harm her or out to hurt her or her family." (Tr. Vol. 2 at 15). In addition, Dr. Sidhu noted that T.M. had "alleged that people ha[d] assaulted her in the hospital" and had reported "hallucinations everyday[.]" (Tr. Vol. 2 at 14). According to Dr. Sidhu, T.M. had told him that she heard voices that told her "to harm others[.]" (Tr. Vol. 2 at 14).

[6] Dr. Sidhu further testified that T.M. had schizo-affective disorder, bipolar type. He also mentioned that he had been treating T.M. with therapy and medication. Specifically, Dr. Sidhu testified that T.M. "ha[d] a long history of mental illness" and "hadn't been compliant with" taking her prescribed medications prior to her admission to the hospital. (Tr. Vol. 2 at 16). While at

the hospital, Dr. Sidhu prescribed T.M. Clozapine for her schizo-affective disorder, Lamictal and Rozerem to help her sleep, and Buspar for her anxiety. Dr. Sidhu also testified that he had spoken to T.M. "[m]ultiple times" about her medications and that T.M. went "back and forth" about whether she needed them. (Tr. Vol. 2 at 16). Dr. Sidhu also told the court that T.M. had mostly refused to take her medications and that, the day before the hearing and the morning of the hearing, T.M. had refused to take her medications because "she didn't feel that she needed medicines[.]" (Tr. Vol. 2 at 16). Dr. Sidhu also testified that T.M., at times, agreed that she had some form of mental illness but that T.M. did not believe that she needed treatment.

[7] Dr. Sidhu continued to note that T.M. "remain[ed] agitated and irritable" but had not been "physically aggressive" over the last couple of days. (Tr. Vol. 2 at 17). He further testified that T.M. continued to have hallucinations and paranoia "which le[d] to [T.M.] becoming aggressive." (Tr. Vol. 2 at 17). Dr. Sidhu also testified that he did not believe that T.M. had been taking care of herself or her basic needs. Specifically, Dr. Sidhu mentioned that T.M. appeared "disheveled" and "not groomed" and that T.M. "d[id not] look like she[] [has been] tending to her ADLs."[3] (Tr. Vol. 2 at 18).

[8] Dr. Sidhu testified that T.M.'s hallucinations were "very chronic and severe[.]" (Tr. Vol. 2 at 20). Dr. Sidhu told the court that T.M.'s hallucinations were

---

[3] ADLs is an acronym for activities of daily living.

"negative, mocking, and . . . can be command as well." (Tr. Vol. 2 at 20). Noting that he typically sees improvements quickly in patients, Dr. Sidhu stated that T.M.'s hallucinations had remained. Dr. Sidhu also testified that T.M. has "a lot of paranoia and delusions" about her family being hurt or killed and "that [the] hallucinations w[ould] hurt her family or her[.]" (Tr. Vol. 2 at 20). Dr. Sidhu testified that these hallucinations impaired T.M.'s ability to function.

[9] When the hospital's counsel asked Dr. Sidhu if he believed that T.M. had the ability to function independently at this time, Dr. Sidhu replied, "[n]o[.]" (Tr. Vol. 2 at 21). Dr. Sidhu testified that T.M. had "a lot of confusion" and that T.M.'s "thoughts [had been] disorganized[,]" which makes it difficult to have a linear conversation with her. (Tr. Vol. 2 at 21). Dr. Sidhu also testified that T.M. had poor insight, judgment, and impulse control. When the hospital's counsel asked Dr. Sidhu if T.M. was a danger to herself or to others, Dr. Sidhu responded, "[y]es" to both questions. (Tr. Vol. 2 at 21). Dr. Sidhu testified that "often people with paranoia, hallucinations, disorganized thinking, confusion . . . [are] [at] high risk of hurting themselves." (Tr. Vol. 2 at 21).

[10] Dr. Sidhu testified that he believed that T.M. needed more time at the hospital and that the hospital was a structured environment where the staff could try to improve T.M.'s condition before releasing her to outpatient care. Dr. Sidhu stated that he believed that there was not a less restrictive placement for T.M. and that it would be "very irresponsible" to discharge T.M. from the hospital. (Tr. Vol. 2 at 22). When the hospital's counsel asked Dr. Sidhu if he believed that it would be appropriate for a special condition to be added to the

commitment order that ordered T.M. not to harass or assault family members, Dr. Sidhu replied, "[y]es." (Tr. Vol. 2 at 23). Dr. Sidhu testified that this special condition should be considered because of T.M.'s aggression and hallucinations.

[11] T.M. testified at the hearing. At the start of T.M.'s testimony, the following exchange occurred:

> [T.M.]: Can I postpone this and refuse to talk right now?
>
> THE COURT: Can you refuse to talk?
>
> [T.M.]: Yes.
>
> THE COURT: Yeah, you can refuse to talk, you can refuse to participate.
>
> [T.M.]: Yes.

(Tr. Vol. 2 at 29). When the hospital's counsel asked T.M. why she did not want to participate, T.M. testified that she did not feel well. T.M. further testified that she had hit her head and that someone had taken an MRI of her stomach instead of her head. When the hospital's counsel asked T.M. why someone would have taken an MRI of her stomach instead of her head, T.M. stated the following:

> This is the hardest part. They only bring in girls here who are pregnant, they give birth to the babies, and they tell them the baby didn't make it. Don't shake your head at me, you should be ashamed of yourself. You know this is going on in here. Sorry, most of the women here are working and pregnant, they tell these women that they lost their babies and when I tell them to tell

them to let me see it, they tell them I'm sorry the baby can't **INDECIPHERABLE** I think they're selling them on the black market.

(Tr. Vol. 2 at 30).

[12] When the hospital's counsel asked T.M. if she had been eating, T.M. explained that she had not been eating the food because "they make it with sh[*]t." (Tr. Vol. 2 at 30). T.M. further testified that she knew that the hospital's food was made with sh*t because she was "a little bit psychic." (Tr. Vol. 2 at 31). The hospital's counsel asked T.M. if she believed that she had a mental illness of any kind, and she replied, "[a]bsolutely not." (Tr. Vol. 2 at 31). T.M. testified that her prescribed medications are "a joke" and that she does not take them, but instead, hides them in her sock. (Tr. Vol. 2 at 32). T.M. explained that the nurses had known that she had put her medications in her sock and expressed concern about how they had known that she had placed her medication in her sock. T.M. also testified that she could "move stuff with [her] eyes" and that someone was "trying to get to [her] family." (Tr. Vol. 2 at 33). T.M. testified that someone was calling her daughter, that someone sounded just like T.M., and that it took them seven years to sound just like T.M. T.M. further testified that "[t]hey take their time in doing what they're doing and then they scam you and take everything you own and love. Manny."[4] (Tr. Vol. 2 at 33). T.M.

---

[4] T.M. clarified that Manny was her son's father.

testified that she would not take medication that had been prescribed to her by an outpatient provider.

[13] T.M.'s counsel cross-examined her at the hearing. During the cross-examination, T.M. testified that she had been "sitting at home in [her] bed with a bat and a knife" to protect herself. (Tr. Vol. 2 at 34). T.M. also testified that "there's cameras all over, everywhere." (Tr. Vol. 2 at 34). During her testimony, T.M. abruptly said the name Manny again before saying, "tell them?" (Tr. Vol. 2 at 35). T.M. further testified that Manny had raped her, was a devil, and could fly. Additionally, T.M. testified that Manny would "leave the house" in a cat mask that she had and would not come back for hours. (Tr. Vol. 2 at 36). T.M. testified that she was "scared being in that house[,]" and Manny would leave. (Tr. Vol. 2 at 36). T.M. testified that she had gotten in her bed, had grabbed her "mom[']s stuffed animal, stuffed animals of [her] sons[,]" a bat, and a knife, and she had watched T.V. until the police had arrived. (Tr. Vol. 2 at 36).

[14] At the conclusion of the presentation of evidence, the trial court found that there was clear and convincing evidence that T.M. had schizo-affective disorder, bipolar type, which is a mental illness. The trial court also found that there was clear and convincing evidence that T.M. was gravely disabled and a danger to others.[5] The trial court was concerned with the danger of T.M., who

---

[5] At the hearing, the trial court stated that T.M. was a danger to herself and others, but the written order provided only that T.M. was a danger to others.

was having hallucinations, going to bed with bats and knives. The trial court further ordered that T.M. be temporarily committed for a period not to exceed ninety days. The trial court also ordered that T.M. take all of her prescribed medications and attend all of her clinic sessions. The trial court further ordered that, because of T.M.'s hallucinations, T.M. not harass or assault family members or others. After the ruling, T.M.'s counsel noted that the trial court had ruled without allowing the parties to make closing arguments, but counsel did not object. T.M.'s counsel also challenged the special condition related to harassing others, but the trial court noted that it had ordered this special condition because T.M. went to bed with bats and knives and had hallucinations.

[15] T.M. now appeals.

## Decision

[16] T.M. argues that: (1) her appeal is not moot under the public interest exception to the mootness doctrine; (2) there was insufficient evidence supporting her commitment order; and (3) there were procedural irregularities that amounted to fundamental error. We address each of her arguments in turn.

### 1. Mootness

[17] As a threshold issue, T.M. argues that, despite the fact that she has been released from her temporary involuntary commitment, her appeal is not moot

under the public interest exception to the mootness doctrine.[6] "A case is moot when the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief." *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022). A moot appeal is subject to dismissal because the opinion is merely advisory if effective relief cannot be granted. *C.P. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 219 N.E.3d 142, 146-47 (Ind. Ct. App. 2023).

[18] "'Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur.'" *E.F.*, 188 N.E.3d at 466 (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)). "Temporary civil commitments can often fit within this public interest exception to mootness because they are transitory in nature and require the delicate balancing of a person's fundamental liberty interest with the safety of individuals and the public." *E.F.*, 188 N.E.3d at 465. Because of the fundamental interests at stake in civil commitment cases, "review of the issues presented is important, including the nuances of the sufficiency of the evidence to support a commitment." *Id.* at 467. "This is especially appropriate in appeals that address novel issues, present a close case, or develop case law on a complicated topic." *Id.* (internal citations omitted). In *E.F.*, our supreme court held that the public interest exception "should be

---

[6] T.M. also argues that her appeal is not moot under the collateral consequences doctrine. Because we have chosen to address her claims under the public interest exception to the mootness doctrine, we need not determine whether the collateral consequences doctrine also applies to T.M.'s appeal.

applied on a case-by-case basis[,]" and that, while appellate courts "may" issue an opinion in a moot temporary commitment appeal, we are not required to do so in "every" case. *Id.* at 465, 466.

[19] Here, although T.M.'s temporary involuntary civil commitment has expired, we exercise our discretion to address her claims under the public interest exception. *See A.O. v. Community Health Network, Inc.*, 206 N.E.3d 1191, 1192 n. 1 (Ind. Ct. App. 2023) (addressing the sufficiency of the evidence in a commitment case under the public interest exception despite the fact that the temporary commitment order had expired); *see also In re Commitment of C.M.*, 191 N.E.3d 278, 280 (Ind. Ct. App. 2022) (same).

## 2. Sufficiency

[20] T.M. argues that there was insufficient evidence supporting the commitment order. The purpose of civil commitment proceedings is to protect the public and to ensure the rights of the person whose liberty is at stake. *T.K.*, 27 N.E.3d at 273. Given the liberty interest at stake, the serious stigma involved, and the adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.* In order to protect the due process rights of a person subject to commitment, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *Id.* "Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. In order to be

clear and convincing, the existence of a fact must be highly probable." *A.P. v. Community Health Network, Inc.*, 238 N.E.3d 704, 709 (Ind. Ct. App. 2024). This standard of proof "communicates the relative importance our legal system attaches to a decision ordering an involuntary commitment," and it has the function of reducing the likelihood of inappropriate commitments. *T.K.*, 27 N.E.3d at 273 (internal quotation marks and citation omitted). When we review the sufficiency of the evidence supporting an involuntary civil commitment, we will affirm if, after considering the probative evidence and reasonable inferences supporting the decision, a reasonable trier of fact could have found the necessary elements proven by clear and convincing evidence. *Id.* We do not reweigh the evidence, nor do we judge witness credibility. *Id.*

[21]     To obtain an involuntary commitment, a petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered). Thus, here, the hospital had the burden of proving subsections (1) and (2) by clear and convincing evidence.

[22]     T.M. does not dispute the sufficiency of the evidence supporting the elements that she is mentally ill and that the commitment is appropriate. Instead, she challenges the "dangerous" and "gravely disabled" elements. Specifically, T.M. contends that the hospital failed to present clear and convincing evidence that she was dangerous to others and that she was gravely disabled.

However, "[i]t is important to note that in order to carry its burden of proof, [the hospital] only had to prove that [T.M.] was either gravely disabled *or* dangerous. It did not have to prove both of these elements." *M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005) (emphasis in original), *trans. denied*. Therefore, we will address only one of these challenged elements.

T.M. argues that there was insufficient evidence that she was gravely disabled. Gravely disabled is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> > (1) is unable to provide for that individual's food, clothing, shelter, or other essential humans needs; or
> >
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

IND. CODE § 12-7-2-96. Because the definition of grave disability is written in the disjunctive, the evidence needs to support only one of those two prongs for a person to be found gravely disabled. *See Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014) (explaining that a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for his basic needs or that his judgment, reasoning, or behavior is so impaired or

deteriorated that it results in his inability to function independently), *trans. denied*.

[25] Here, during the temporary commitment hearing, the hospital met its burden of proving the involuntary commitment elements through the testimony of Dr. Sidhu, who testified that T.M. had poor insight, judgment, and impulse control and that T.M.'s condition impaired her ability to function. Specifically, Dr. Sidhu testified that T.M. had always expressed paranoia and concern that other people were going to hurt her or her family. Dr. Sidhu also testified that T.M. had alleged that people had assaulted her at the hospital, that T.M.'s hallucinations were chronic and severe, and that T.M. also had command hallucinations. Dr. Sidhu testified that T.M.'s hallucinations were negative and mocking and that her hallucinations were not improving. Further, Dr. Sidhu testified that T.M. suffered from confusion and had trouble with linear conversations. Dr. Sidhu also testified that T.M.'s paranoia and hallucinations led to her becoming aggressive. Dr. Sidhu recommended that T.M. stay at the hospital, which was a structured environment, until T.M.'s condition improved and she could return to outpatient care.

[26] We further note that T.M.'s testimony was concerning. Specifically, T.M. testified that the hospital was stealing babies from pregnant women and selling them on the black market. T.M. also testified that the hospital was putting sh*t in her food and that she knew this because she was psychic. T.M. further testified that she could move things with her eyes and expressed concern that someone was impersonating her while talking to her daughter. During her

testimony, T.M. also denied having a mental illness, refused to take her medications, expressed multiple paranoid thoughts about the hospital staff and cameras being everywhere, and made troubling statements about Manny. T.M.'s testimony corroborated much of Dr. Sidhu's testimony about T.M.'s impairment. The record contains ample evidence of T.M.'s grave disability.[7]

[27] In light of the clear and convincing evidence that T.M. was gravely disabled, we conclude that the trial court did not err when it ordered that T.M. be involuntarily committed for a period not to exceed ninety days. Therefore, we affirm the trial court's commitment order.[8]

## 3. Fundamental Error

[28] T.M. argues that the remotely held commitment hearing, the trial judge's failure to turn on her camera, and the trial court's act of entering a ruling

---

[7] T.M. argues that Dr. Sidhu's testimony revealed "merely symptoms of [her] mental illness" and that the hospital needed to prove that "T.M. could not function independently without coming to harm due to her impaired judgement and behavior." (T.M.'s Br. 20). Dr. Sidhu's testimony, however, covered more than just T.M.'s symptoms. Further, much of Dr. Sidhu's testimony about T.M. was further corroborated by T.M.'s own testimony. T.M. also cites to *T.K.*, 27 N.E.3d at 276, for the proposition that "[s]tanding alone, a respondent's refusal to take medication and denial of illness is insufficient to establish grave disability." (T.M.'s Br. 21). But, as discussed above, the record contained much more evidence than T.M.'s refusal to take her medication and denial of mental illness.

[8] T.M. also challenges the trial court's special finding that she refrain from harassing or assaulting family members. However, because the commitment order has expired and T.M.'s challenge to this special finding is specific to her individual case, we do not find that the public interest exception applies to this issue. *See E.F.*, 188 N.E.3d at 467 (ruling that when an appellate court elects to address an issue under the public interest exception, it need not address all the issues in the case). *See also H.J. v. Health and Hosp. Corp.*, 243 N.E.3d 375, 381 (Ind. Ct. App. 2024) (holding that, in a civil commitment case with an expired order, the public interest exception did not apply to an appellant's arguments challenging the trial court's special finding ordering the appellant to take his medication because the commitment order had expired and the appellant's medication claims were specific to his individual case), *trans. denied*.

without providing counsels an opportunity to give a closing argument, when taken together, amounted to fundamental error. T.M. acknowledges that she did not object to any of these alleged errors. As a result, we review the alleged procedural irregularities only for fundamental error. "An error is fundamental, and thus reviewable on appeal, if it made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (internal quotation marks and citation omitted). "Fundamental error is an essential safety-valve doctrine that permits appellate courts to order relief due to an undeniable and substantial error that unfortunately slipped past the trial court; it is not a doctrine that exists to simply give appellants a chance to argue that some unpreserved error should nonetheless be reviewable on direct appeal." *Willoughby v. State*, 244 N.E.3d 473, 476 (Ind. Ct. App. 2024), *trans. denied*. In order to be deemed fundamental, an error must be so likely to have infected the verdict or judgment that confidence in the correctness of the trial result has been undermined. *M.E. v. V.A. Medical Ctr.*, 957 N.E.2d 637, 638 (Ind. Ct. App. 2011) (internal quotation marks and citations omitted).

[29] First, T.M. argues that the trial court erred when it held the commitment hearing remotely. T.M. specifically argues that the trial court erred when it held her commitment hearing remotely because the trial court did not set forth particular and specific facts explaining why it was holding the hearing remotely and there was no agreement by the parties to hold the hearing remotely.

Indiana Administrative Rule 14[9] ("Rule 14") explains when and how trial courts may conduct remote proceedings using telephone or audiovisual telecommunication. *B.N. v. Health & Hosp. Corp.*, 199 N.E.3d 360, 363 (Ind. 2022). Rule 14 provides:

> **A. Definitions**
>
>> 1. A "remote proceeding" is any proceeding, including without limitation entire proceedings or parts of it, using telephone or videoconferencing capabilities to allow case participants to appear virtually.
>>
>> * * * * *
>>
>> 3. A "testimonial proceeding" is a proceeding in which the judge receives sworn oral testimony.
>>
>> * * * * *
>
> **C. Authority in testimonial proceedings.** A court must conduct all testimonial proceedings in person except that a court may conduct the proceedings remotely for all or some of the case participants for good cause shown or by agreement of the parties. Remote proceedings must comply with constitutional and statutory guarantees.

Ind. Administrative Rule 14.

Our Supreme Court has held that under Rule 14, "good cause requires a particular and specific demonstration of fact." *B.N.*, 199 N.E.3d at 364. The

---

[9] Indiana Administrative Rule 14 was replaced by Interim Indiana Administrative Rule 14 on January 1, 2023. As of April 2025, there is a proposed final version of Administrative Rule 14 and our supreme court has invited public comment on the proposed rule.

Court noted that trial courts have significant discretion to hold remote proceedings over an objection when good cause is shown. *Id.* "But they must offer something more than a one-size-fits-all, boilerplate pronouncement; good cause requires something specific to the moment, the case, the court, the parties, the subject matter, or other relevant considerations." *Id.*

[32] Our review of the record reveals that the hospital, in its commitment petition, alleged that, in its opinion, "holding the hearing in the courtroom would have a harmful effect on [T.M.]'s health or well-being." (App. Vol. 2 at 17). The trial court then issued an order setting the commitment hearing "over video[.]" (App. Vol. 2 at 24). However, the trial court made no finding of good cause as to why it was holding the hearing remotely in its order. Nor did the trial court make any good cause showing at the commitment hearing. T.M. contends that she had not agreed to a remote hearing, and we find nothing in the record that demonstrates that the parties had agreed to a remote hearing. Therefore, there was neither particular and specific demonstration of fact made by the trial court explaining why it was holding the hearing remotely nor an agreement by the parties to participate in the hearing remotely as required by Rule 14. The Rule makes clear that the default for a commitment hearing is an in-person hearing. As a result, we hold that the trial court erred by holding a remote commitment hearing without satisfying the requirements of Rule 14. *See B.N.*, 199 N.E.3d at 365 (holding that the trial court failed to comply with the good cause requirement of Rule 14 when, after a party objected, the trial court only

generally stated that the commitment hearing was being held remotely due to the COVID-19 pandemic).[10]  However, this error was not fundamental error.

[33]  We next turn to T.M.'s argument that the trial court erred when it did not turn on its camera and failed to give the parties an opportunity to give closing arguments.  Turning first to T.M.'s camera argument, we note that Rule 14, in its current form, does not specifically require a trial court to turn on its camera.  The commentary to Rule 14, however, provides that "[c]ourts should determine on a case-by-case basis whether telephone or video technology is appropriate.  Some case participants may appear by telephone, some by video, and some in person all on the same case."  Admin R. 14 cmt. ¶ 3.  Here, it appears that the trial court did not deliberately fail to turn on its camera, but instead, struggled to turn on its camera due to technical difficulties.  That being said, we encourage our trial courts to turn their cameras on in all of their remotely held hearings, but, this too, was not fundamental error.[11]

---

[10] The hospital argues that Rule 14 does not require a showing of good cause to "schedule a remote proceeding" or to "conduct a remote proceeding when neither party objects." (Appellee's Br. 34).  Instead, the hospital argues that good cause is only required "when holding a remote proceeding over a party's objection." (Appellee's Br. 34).  But, the plain text of Rule 14 provides that "a court may conduct the proceedings remotely for all or some of the case participants for good cause shown or by agreement of the parties."  Admin R. 14.

[11] T.M. distinguishes the facts of her case from *C.S. v. State*, 131 N.E.3d 592 (Ind. 2019).  In *C.S.*, our supreme court addressed a fundamental error argument in the context of two remote juvenile dispositional hearings.  There, the parties participated in their dispositional hearings remotely and argued that inadequate equipment or equipment failures constituted fundamental error because "portions of their statements were noted by the court reporter as indiscernible." *Id.* at 599.  But, our supreme court held that these arguments did not constitute fundamental error because the record demonstrated that it was "unlikely that technical issues impacted the hearings." *Id.*  Our supreme court noted that participants who had been present in the courtroom made statements that were also transcribed as indiscernible, and thus, testimony noted as

[34] Turning to T.M.'s argument regarding closing argument, we find *H.J.* to be instructive. In *H.J.*, a panel of our Court addressed an argument that the trial court had fundamentally erred when it had failed to allow the parties to make a closing argument. In that case, our Court noted the "overwhelming evidence" supporting the commitment order and concluded that "even if H.J. had presented closing argument, it would not have changed the result." *H.J.*, 243 N.E.3d at 381. Our Court held that H.J. had failed to show fundamental error. *Id.* Here, as in *H.J.*, there was overwhelming evidence supporting the trial court's findings that T.M. was gravely disabled. Even if T.M.'s counsel presented a closing argument, the result would not have been different.

[35] While neither of T.M.'s alleged procedural errors would have changed the result of the proceeding, it remains for us to consider whether the cumulative effect of those errors rises to the level of fundamental error. T.M. argues that "[c]onsidering the procedural irregularities together," T.M. received a "fundamentally different" proceeding. (T.M.'s Reply Br. 19). T.M. further argues that this fundamentally different proceeding amounted to fundamental error.[12] The hospital, on the other hand, argues that T.M. has failed to show

---

indiscernible in the transcripts were not "tied exclusively to remote participants." *Id.* at 600. Further, it noted that the participants in the hearing did not appear to have trouble hearing one another. T.M. argues that in *C.S.*, the indiscernible transcriptions were not unique to the remote participants because there was no technological issue, but here, the trial court's camera being off was a technical issue and a direct result of the remote hearing. But, this point does not explain how the trial court's camera being turned off impacted the hearing in such a way that would constitute fundamental error.

[12] T.M. also cites to several child in need of services cases for the proposition that a "combination of procedural irregularities can be significant enough to constitute a deprivation of procedural due process." (T.M.'s Reply Br. 20). But, our review here is limited to one of fundamental error.

fundamental error because "T.M. doesn't explain how her alleged irregularities meet" the high standard that fundamental error requires. (Hospital's Br. 42). Additionally, the hospital argues that any alleged error was harmless.

[36] As noted above, our review of the record reveals that the evidence supporting T.M.'s commitment was overwhelming. Dr. Sidhu testified at length about T.M.'s condition and his medical opinion. He noted T.M.'s paranoia and hallucinations, her denial of mental illness, her refusal to take her medication, and her unimproved condition. Dr. Sidhu testified that T.M.'s hallucinations included command, negative, and mocking hallucinations. Dr. Sidhu described the hallucinations as severe and chronic, and he was very clear about how T.M.'s condition impaired her ability to function. In addition, T.M. also testified at the hearing and corroborated many of Dr. Sidhu's concerns. Further, T.M. was present and actively participated in the hearing and conferred with her counsel in a separate breakout room. Additionally, her counsel thoroughly cross-examined Dr. Sidhu and successfully lodged objections to Dr. Sidhu's testimony.

[37] As noted above, to amount to fundamental error, the error must have made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm. *Durden*, 99 N.E.3d at 652. Further, the error must be so likely to have infected the verdict or judgment that confidence in the correctness of the trial result has been undermined. *M.E.*, 957 N.E.2d at 638. Given the record before us, we hold that T.M. has failed to overcome the high bar

required to constitute fundamental error. *See H.J.*, 243 N.E.3d at 381 (holding that H.J. had not shown fundamental error due to a trial court not allowing closing argument during a commitment hearing where the evidence was overwhelming and that even if H.J. had given closing argument, it would not have changed the result); *C.S.*, 131 N.E.3d at 599-600 (holding that the parties did not show fundamental error due to technical difficulties resulting in portions of their statements being transcribed as indiscernible because in person participants' statements were also transcribed as indiscernible, and thus, the technological issues likely did not impact the hearing). *See also B.N.*, 199 N.E.3d at 365 (holding that the trial court's error of not showing good cause to hold a commitment hearing remotely was harmless where B.N. was present throughout her hearing, actively participated by testifying and conferring with counsel, technological errors were minor and quickly remedied, and counsel skillfully objected and vigorously cross-examined witnesses).

Affirmed.


Bradford, J., and Kenworthy, J, concur.

ATTORNEYS FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Joel M. Schumm
Appellate Clinic
Indiana University
Indianapolis, Indiana

Jon Gobeyn
Certified Legal Intern
Appellate Clinic
Indiana University
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Rani B. Amani
Ice Miller LLP
Indianapolis, Indiana